# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| SANDRA J. NEHER, ) <br> ) <br>       **Plaintiff,** ) <br> ) <br>       v. ) <br> ) <br> CAROLYN W. COLVIN, Acting ) <br> Commissioner of Social Security,[1] ) <br> ) <br>       **Defendant.** ) <br> ) | No. 14 C 5430 <br><br> **Magistrate Judge** <br> **Susan E. Cox** |

## MEMORANDUM OPINION AND ORDER

Plaintiff Sandra J. Neher ("Plaintiff" or "Neher") appeals the Commissioner of Social Security's decision to deny her Social Security Disability benefits under Title II of the Social Security Act ("the Act") and Supplemental Security Income under Title XVI of the Social Security Act. We hereby construe Plaintiff's memorandum in support of summary judgment [dkt. 16] as a motion. We grant Plaintiff's motion for summary judgment [dkt. 16] and deny the Commissioner's motion for summary judgment [dkt. 17]. The Administrative Law Judge's decision is reversed and remanded for further proceedings consistent with this opinion.

## STATEMENT

On November 6, 2006, Plaintiff filed a claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), alleging disability beginning May 15, 2005, due to depression, osteoporosis, carpal tunnel, and neck pain.[2] The claim was denied initially on February 13, 2007, and upon reconsideration on July 26, 2007; after which, she timely requested

---

[1] Carolyn W. Colvin is substituted for her predecessor, Michael J. Astrue, pursuant to Federal Rule of Civil Procedure 25(d).
[2] R. 254-57.

a hearing before an Administrative Law Judge ("ALJ"), which was held on June 18, 2008 before ALJ Ayrie Moore.[3] On November 5, 2008, ALJ Moore denied Neher's claims for both DIB and SSI, finding her not disabled under the Act.[4] On December 11, 2008, Plaintiff requested review by the Social Security Administration ("SSA") Appeals Council.[5]

On December 15, 2008, while Plaintiff's initial claims were being reviewed by the Appeals Council, she filed new applications for both DIB and SSI.[6] On March 9, 2009, a state agency reviewing physician found that Plaintiff's impairments met Listing 12.04(C) (for depression) and 12.06, A and B (for anxiety), as of November 22, 2008. The Appeals Council, upon its own initiative, chose to review the approval of Plaintiff's new claims, finding that the state agency decision and the ALJ's decision made findings for essentially the same period, resulting from essentially the same impairments; however, they came to inconsistent conclusions.[7] As such, on September 22, 2009, the Appeals Council remanded Plaintiff's case (including the favorable determination) back to the ALJ for further review.[8] The Appeals Council directed the ALJ to consider the entire time period at issue, from Plaintiff's alleged onset date of May 15, 2005, through the date of the ALJ's decision.[9]

On May 12, 2010, a new hearing was held before ALJ Marlene R. Abrams. That hearing was continued to attempt to retrieve the state agency determination, which awarded Plaintiff benefits.[10] On August 1, 2011, a supplemental hearing was held before ALJ Abrams.[11] On April

---

[3] R. 59, 280-83, 285-88.
[4] R. 262-78.
[5] The April 17, 2012 ALJ decision in the record at page 32 and the letter from the Appeals Council dated July 14, 2009, incorrectly indicated that Ms. Neher filed her appeal on October 31, 2008, before the ALJ even rendered the November 5, 2008 decision. However, the Record indicates that the actual date Ms. Neher filed her appeal was on December 11, 2008. R. 331-45.
[6] R. 32.
[7] R. 260.
[8] R. 258-61.
[9] R. 260-61.
[10] R. 115-17.

17, 2012, ALJ Abrams found Plaintiff not disabled, and issued an unfavorable decision for the entire period at issue.[12] The Appeals Council then denied Neher's request for review on July 19, 2013, leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by the District Court under 42 U.S.C. § 405(g).[13]

The ALJ found, *inter alia*, that: 1) the claimant meets the insured status requirements of the Act through December 31, 2009; 2) the claimant has not engaged in substantial gainful activity since May 15, 2005, the alleged onset date (20 CFR 404.1527 *et seq*., and 416.971 et seq.).; 3) the claimant has the following severe impairments: bilateral carpal tunnel syndrome, chronic neck pain, major depressive disorder, generalized anxiety, posttraumatic stress disorder, and a history of polysubstance abuse (20 CFR 404.1520(c) and 416.920(c); 4) the claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P. Appendix 1 (20 CFR 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926); 5) the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), with additional stipulations, including that she is limited to standing/walking up to two hours at one time, and sitting standing/walking up to a total of six hours in an eight hour work day, except; she can never climb ladders, ropes, or scaffolds; she can frequently bend, and stoop and occasionally kneel, crawl, and crouch; she can bilaterally frequently reach including overhead reaching, and frequently perform gross and fine manipulations. She has the following nonexertional limitations: the claimant is limited to simple, routine, repetitive tasks in which there are only routine changes, and the work setting was predictable. Socially, there would only

---

[11] R. 126-253.
[12] R. 29-51.
[13] *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

3

be incidental interaction with the general public, but no ongoing face to face interaction, and occasional interaction with coworkers and supervisors, but not tandem task.

## DOCUMENTARY EVIDENCE

Ms. Neher has a long history of depression dating back to 1996.[14] On October 25, 2006, Plaintiff began treatment with a psychiatrist, Dr. Salvatore Meccia, M.D. at Meccia Mental Health.[15] She reported that she was previously involved in an abusive relationship with her deceased ex.[16] She also reported that she was again involved in an abusive relationship with her then fiancé.[17] She reported depression, anxiety, poor sleep, poor focus, poor appetite, feeling trapped and occasional suicidal ideation, but no attempt.[18] Dr. Meccia noted that Plaintiff's affect was stable and depressed.[19] On January 10, 2007 and February 7, 2007 follow-up visits with Dr. Meccia, Plaintiff was still depressed and anxious.[20]

On January 3, 2007, Plaintiff underwent a consultative psychiatric evaluation by Dr. Herman P. Langner, M.D.[21] Plaintiff reported that she suffered from depression.[22] She also reported crying a lot, feeling constantly nervous, and being extremely comfortable around other people. Previously, she was physically and mentally abused by her sons' deceased father, and she denied hallucinations or suicidal ideations.[23] Dr. Langner indicated that Plaintiff was oriented times three, had a flat affect, was relevant and coherent, and did not suffer from obvious

---

[14] R. 626.
[15] R. 617, 634.
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] R. 689, 809.
[21] R. 636.
[22] *Id.*
[23] *Id.*

4

perceptual disturbances.[24] Dr. Langner diagnosed Plaintiff with depression and assigned her a GAF score of 40.[25]

The records from Plaintiff's follow-up visits over the course of several years with Dr. Meccia indicate that she was suffering from depression and anxiety.[26] Many of these visits included notes from Dr. Meccia that Plaintiff was "stable" at baseline.[27] On August 5, 2011, Dr. Meccia wrote a letter clarifying the definition of "stable."[28] Dr. Meccia wrote that the "definition of stable means [Plaintiff] has not required hospitalization and has not deteriorated past baseline."[29] Dr. Meccia further stated that "[Plaintiff's] baseline was severe pathological anxiety and depression," and that Plaintiff "remain[ed] marginally functional at best, even while tak[ing] her medications."[30] Dr. Meccia concluded that "stable in no way, shape, or form is meant to imply cured or fixed," and that Plaintiff was "not able to function in this complex society," and "in [his] professional opinion, [Plaintiff was] unfit to work and permanently disabled."[31]

At the time of the June 18, 2008 hearing, Ms. Neher was forty years old and lived with her fiancé and three children.[32] Plaintiff testified that she was disabled since May 15, 2005, and had not worked since that time.[33] She previously worked as a bartender; however, she stopped because it was a public position and she was afraid of people.[34] She felt she could not work because she had carpal tunnel, suffered a sexual assault the previous year, and developed a

---

[24] R. 636-37.
[25] R. 638.
[26] R. 690, 781, 877, 891.
[27] R. 779, 783-84, 872-76, 887-88.
[28] R. 1144.
[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] R. 64.
[33] R. 66-67.
[34] R. 67.

5

mental problem due to many years of abuse.[35] She reported having daily panic attacks where she became speechless, nauseated, and felt as though she was going to have a heart attack.[36] During the attacks, she would lay down until they subsided.[37] She regularly took anxiety medication; however it was sporadically effective.[38] She did not like men she did not know, and when she went to the store she would run with her daughter through the parking lot to hurriedly get inside.[39] She cooked for her children and provided them clean clothes and she bathed and dressed her daughter; however, she did not attend her children's school functions.[40]

At the time of the August 1, 2011 administrative hearing, Ms. Neher testified that she was forty-three years old, and had not been engaged in work activity since May of 2005.[41] Plaintiff stated that being abused may have led to her depression.[42] Previously, she worked for approximately twenty years in the restaurant industry.[43] She worked at White Castle as an assistant supervisor; however, she left because she did not feel right handling customer complaints.[44] She also walked her daughter seven blocks to school and jogged back because she wanted to get home.[45] The past two months, her neighbor drove them to school and back.[46] Plaintiff stated that she had not driven for a couple of years because she did not feel like going anywhere and wanted to stay home.[47] However, she attended a family reunion in Kentucky for six days.[48] Most of the day, she was in her pajamas watching television or looking out the

---

[35] *Id.*
[36] R. 73.
[37] R. 73-74.
[38] R. 74.
[39] R. 82.
[40] R. 86-87.
[41] R. 138.
[42] R. 140.
[43] R. 141-43.
[44] R. 142.
[45] R. 150.
[46] *Id.*
[47] R. 149.
[48] R. 220-21.

window.[49] She did not shop for groceries, attend school functions, or go out to eat with her family.[50] She would brush her teeth, but would not take care of her other personal grooming because she did not feel the urge to do so.[51] She helped care for her daughter by brushing her hair and helping her wash.[52] Plaintiff stopped cooking approximately six or seven years ago and did not cook for herself or her family.[53] She did not do laundry or wash dishes.[54] Both of her sons took care of the household chores.[55] Previously, her fiancé and father of her daughter, helped with chores until they separated in January of 2010.[56] He was physically and mentally abusive to Neher.[57] After one instance of abuse, a girlfriend encouraged her go to the emergency room and also encouraged her to file an order of protection.[58] According the Plaintiff, the girlfriend did all of the steps, Plaintiff just followed, and eventually separated from her fiancé.[59]

Medical Expert Dr. Ellen Rosenfeld, Ph.D. testified at the hearing.[60] Dr. Rosenfeld addressed Plaintiff's mental impairments and stated the record indicated that Plaintiff had major depression, generalized anxiety, suffered a traumatic event, PTSD, and a history of poly substance abuse.[61] Dr. Rosenfeld felt that Plaintiff's assessed GAF score of 40, during her consultative examination in January 2007 with Dr. Langer, was inconsistently low with the results of the mental status exam.[62] Dr. Rosenfeld stated that Plaintiff was consistently seen by her treating physician Dr. Meccia, and noted as stable; which, was further supported by records

---

[49] R. 156-57.
[50] R. 149-50, 156.
[51] R. 151.
[52] R. 152.
[53] R. 152-53.
[54] R. 153.
[55] *Id.*
[56] *Id.*
[57] R. 155.
[58] *Id.*
[59] *Id.*
[60] R. 191-244.
[61] R. 224, 228, 232.
[62] R. 228-29.

7

from Plaintiff's other medical providers.[63] Dr. Rosenfeld also pointed out that several treatment notes and testimony indicated that Plaintiff could care for her family, went on a family trip, walked her daughter to and from school, and left an abusive relationship.[64] Dr. Rosenfeld stated that those notes and Plaintiff's behavior were inconsistent with the reports of someone who never went out alone, did not leave the house, or was unable to do anything.[65] Dr. Rosenfeld concluded that the evidence did not support a finding of Plaintiff meeting or equaling a listing.[66] Dr. Rosenfeld stated that Plaintiff was limited to simple, routine tasks; incidental contact with the general public and no face to face ongoing interaction; and occasional contact with supervisors and co-workers, with no joint tasks.[67] Plaintiff would be restricted to a predictable work setting with routine changes.[68] However, if full credence was given to Plaintiff's testimony, Dr. Rosenfeld stated that she would not be able to sustain competitive employment.[69]

## DISCUSSION

### I. STANDARD OF REVIEW

The ALJ's decision must be upheld if it follows the administrative procedure for determining whether the plaintiff is disabled as set forth in the Act,[70] if it is supported by substantial evidence, and if it is free of legal error.[71] Substantial evidence is "relevant evidence that a reasonable mind might accept as adequate to support a conclusion."[72] Although we review

---

[63] R. 229.
[64] R. 230-33.
[65] R. 231-33.
[66] R. 237.
[67] *Id.*
[68] *Id.*
[69] R. 241.
[70] 20 C.F.R. §§ 404.1520(a) and 416.920(a).
[71] 42 U.S.C. § 405(g).
[72] *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).

8

the ALJ's decision deferentially, she must nevertheless build a "logical bridge" between the evidence and her conclusion.[73] A "minimal[ ] articulat[ion] of her justification" is enough.[74]

## II. THE ALJ FAILED TO APPLY THE "TREATING PHYSICIAN RULE."

Plaintiff first claims that the ALJ failed to follow the "treating physician rule" by not appropriately weighing the opinions of her treating psychiatrist, Dr. Meccia. Plaintiff contends that both opinions from Dr. Meccia should have been given controlling weight over the opinion of the non-examining medical expert, Dr. Rosenfeld, because Dr. Rosenfeld, and the ALJ misinterpreted Dr. Meccia's treatment notes and incorrectly defined Dr. Meccia's meaning of the term "stable."[75] Plaintiff contends that although she was "stable" she still had serious limitations in her ability to perform various functions which are required in the workplace, and that Dr. Meccia's subsequent August 15, 2011 opinion explained that the meaning of "stable" meant that Plaintiff had not deteriorated past baseline.[76] Further, Plaintiff contends that Dr. Meccia's opinion regarding the definition of stability must be considered over the ALJ's lay understanding of the term.[77] Next, Plaintiff contends that rejecting Dr. Meccia's August 15th opinion because it was obtained after the administrative hearing, was not a reasonable basis for rejecting that opinion.[78] Lastly, Plaintiff contends that the ALJ was required but failed to evaluate the required factors in 20 C.F.R. §§ 404.1527 and 416.927, before she accepted one physicians opinion over another.

An ALJ must give controlling weight to a treating physician's opinion if the opinion is both "well-supported" and "not inconsistent with the other substantial evidence" in the case

---

[73] *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).
[74] *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008).
[75] Pl.'s Mem. at 15, 19.
[76] Pl.'s Mem. at 16.
[77] Pl.'s Mem. at 17.
[78] *Id.*

9

record.[79] The ALJ must also "offer good reasons for discounting" the opinion of a treating physician[80] And even if a treater's opinion is not given controlling weight, an ALJ must still determine what value the assessment does merit.[81] The regulations require the ALJ to consider a variety of factors, including: (1) the length, nature, and extent of the treatment relationship; (2) the frequency of examination; (3) the physician's specialty; (4) the types of tests performed; and (5) the consistency and support for the physician's opinion.[82]

The ALJ's decision to attribute only minimal weight to Dr. Meccia's opinion was not supported by substantial evidence because the ALJ misunderstood Dr. Meccia's use of the term "stable," and assigned meaning to the term using his own lay person's definition. Here, the ALJ rejected Dr. Meccia's August 15th opinion, which clarified his meaning of stability, because it was submitted after the hearing. While the ALJ was not required to consider Dr. Meccia's August 15th opinion after the administrative hearing,[83] the ALJ was not allowed to rely on his own lay person's definition of stability. An ALJ may not "play doctor" by using his own lay opinions to fill evidentiary gaps in the record.[84] The ALJ relied on a lay person's definition of "stable," opining that prior to the hearing, Plaintiff's representative was aware and had an apparent concern relating to Dr. Meccia's stable findings and that it would have been more reasonable and persuasive for the representative to request an explanation from Dr. Meccia, "especially if there was going to be an assertion that the doctor did not intend to imply the commonly understood meaning of the word stable." While it may have been reasonable and

---

[79] 20 C.F.R. § 404.1527(c); *see Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011).
[80] *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (internal quotations omitted); *Scott*, 647 F.3d at 739.
[81] *Scott*, 647 F.3d at 740; *Campbell*, 627 F.3d at 308.
[82] See *id*.
[83] *See Willis v. Comm'r of Soc. Sec.*, No. 10-CV-310-PMF, 2011 WL 4037032, at *4 (S.D. Ill. Sept. 12, 2011) (Once concluded, ALJs have the option to reopen a hearing to receive new and material evidence, but are under no obligation to do so); *see also* 20 C.F.R. § 404.944,
[84] *See Chase v. Astrue*, 458 F. App'x 553, 557 (7th Cir. 2012) citing *Myles v. Astrue,* 582 F.3d 672, 677 (7th Cir.2009).

persuasive for the representative to request an explanation from Dr. Meccia before the hearing, it would have been just as reasonable for the ALJ to request an explanation of Dr. Meccia's meaning of the term "stable." It is not appropriate to assume that a person characterized as "stable" is able to work.[85] One can be stable and yet disabled,[86] and it is the ALJ's responsibility to recognize the need for further clarification of a claimant's conditions and to fully develop the record before making RFC and disability determinations, and here the ALJ should have sought further clarification from Dr. Meccia on his use of the term "stable."[87] The ALJ may have come to a different conclusion altogether on Dr. Meccia's opinions and Plaintiff's functional impairments, if he had correctly interpreted the term "stable," and it is quite possible that Dr. Meccia's general opinion would have been afforded greater weight over the opinion of Dr. Rosenfeld. Therefore, the ALJ's decision to attribute only minimal weight to Dr. Meccia's opinion was not supported by substantial evidence. In addition, on remand the ALJ should take particular care to review and discuss the regulatory factors set forth in factors set forth in 404.1527(c)(1)-(6).

### III.  THE ALJ FAILED TO PROPERLY EVALUATE PLAINTIFF'S CREDIBILITY

Plaintiff argues that the ALJ's credibility determination was legally insufficient.[88] Plaintiff contends that the ALJ appeared to be grasping at straws in order to find reasons to question Plaintiff's credibility.[89] First, Plaintiff contends that the ALJ erred in attempting to diminish Plaintiff's credibility because 1) she provided care for her daughter, 2) had gone to a

---

[85] *Hunt v. Astrue*, 889 F. Supp. 2d 1129, 1144 (E.D. Wis. 2012).
[86] *Lechner v. Barnhart,* 321 F.Supp.2d 1015, 1030 (E.D.Wis.2004).
[87] *Boiles*, 395 F.3d at 425 (7th Cir. 2005); *Chase*, 458 F. App'x at 557 (7th Cir. 2012) *citing Scott v. Astrue,* 647 F.3d 734, 741 (7th Cir.2011).
[88] Pl. Mem. at. 21.
[89] Pl.'s Mem. at 23.

family reunion, 3) had managed to leave an abusive relationship, and 4) had sought treatment had appeared to have the motivation to change.[90]

The lack of objective evidence is not by itself reason to find a Plaintiff's testimony to be incredible.[91] When evaluating a plaintiff's credibility, the ALJ must also consider "(1) the Plaintiff's daily activity; (2) the duration, frequency, and intensity of pain; (3) the precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions."[92] When the Plaintiff attends an administrative hearing, the ALJ "may also consider his or her own recorded observations of the individual as part of the overall evaluation of the credibility of the individual's statements."[93]

The Court finds that the ALJ did not adequately evaluate Plaintiff's credibility because his reasoning was not supported by substantial evidence. The ALJ's finding that Plaintiff lacked credibility because she was able to escape an abusive relationship, and "demonstrated the courage to take a break," is illogical and in error. Here, despite the ALJ finding otherwise, the fact that Plaintiff was able to finally escape years of abuse from her fiancé does not mean that she lacked severe functional impairments or that she was capable of working. The ALJ also neglected to mention that Plaintiff reported that she was only able to escape and prosecute her oppressor because she received significant help and encouragement from a dear friend.[94]

Next, although Dr. Rosenfeld interpreted Plaintiff's statements of never leaving her home, never going out alone, and never shopping as categorical and grandiose, it does not mean that Plaintiff's symptoms were not severe enough to cause severe functional impairments. Nor does Plaintiff going on one family reunion trip and one camping trip over a six-year period

---

[90] Pl.'s mem. at 21-23.
[91] *See Schmidt v. Barnhart*, 395 F.3d 737, 746-47 (7th Cir. 2005).
[92] *See Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004); *see also* SSR 96-7p at *3.
[93] *See* SSR 96-7p at *5.
[94] *Supra* notes 114-15.

12

suggest that Plaintiff's statements about her impairments were not credible. Further, the ALJ did not further inquire into whether Plaintiff's reunion trip activities were inconsistent with her reported functional limitations.[95]

In addition, the ALJ failed to mention that while Plaintiff admitted to taking her daughter to school, which was only a mere seven blocks, she also admitted running back home afterwards because she was afraid of people. The ALJ also failed to mention that while Plaintiff reported greater daily activity in the earlier years of her alleged onset, it was documented throughout the medical evidence and by testimony that Plaintiff performed those activities under fear, threat, and pressure from her fiancé or otherwise risk suffering abuse. While an ALJ need not mention every piece of evidence in her opinion, she cannot ignore a line of evidence that suggests a disability.[96]

Lastly, it was improper for the ALJ to discredit the Plaintiff's functional limitations because she cared for her daughter.[97] Here, Plaintiff provided basic care for her daughter such as bathing, cooking, taking her to school and looking after her. As her symptoms progressed, she reported only taking her daughter to school and watching television with her. Similar to *Beardsley*,[98] these activities hardly compare to engaging in substantial gainful activity, and lend no support to the conclusion that she would be able to spend six hours a day, every day, on her feet standing, or walking, or sitting while working.[99] In addition, although Plaintiff cared for her daughter at a basic level, she previously had help from her former fiancé and now her older sons.

---

[95] *See Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014), *as amended* (Aug. 20, 2014), *reh'g denied* (Oct. 10, 2014) (holding a claimant's vacationing does not support an inference of disability without further inquiring into claimant's activities while on vacation.)
[96] *Jones,* 623 F.3d at 1162. *See Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013).
[97] *See Beardsley v. Colvin*, 758 F.3d 834, 838 (7th Cir. 2014), (noting that it is proper for the Social Security Administration to consider a claimant's daily activities in judging disability, but urging caution in equating these activities with the challenges of daily employment in a competitive environment, especially when the claimant is caring for a family member).
[98] *Id.*
[99] *Id.*

Therefore, the ALJ's conclusion that Plaintiff was not credible was not based on substantial evidence.

## **CONCLUSION**

For the foregoing reasons, we remand this matter for further proceedings consistent with this opinion. Plaintiff's motion for summary judgment is granted [dkt. 16] and the Commissioner's motion for summary judgment is hereby denied [dkt. 17].

**ENTER:**
**DATED:** January 22, 2015

Susan E. Cox
United States Magistrate Judge